DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
*Attorneys for the Debtor*
One North Lexington Avenue
White Plains, New York 10601
(914) 681-0200
JONATHAN S. PASTERNAK, ESQ.
JULIE C. CURLEY, ESQ.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In re:

ONE FOR THE MONEY, LLC,

                         Debtor.
-----------------------------------------------------------X

                                       Chapter 11

                                       Case No. 15-10188(SCC)

## DISCLOSURE STATEMENT

One For the Money, LLC (the "Debtor") submits this Disclosure Statement pursuant to Section 1125(b) of Title 11, United States Code, 11 U.S.C. §§ et seq. (the "Bankruptcy Code") and Rule 3017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), in connection with its Liquidating Chapter 11 Plan, dated May 27, 2015 (the "Plan") to all known holders of Claims against or Interests in the Debtor in order to adequately disclose information deemed to be material, important and necessary to make a reasonably informed judgment about the Plan, including, who is entitled to vote to accept or reject the Plan. A copy of the Plan is attached hereto as Exhibit "A".

On May __, 2015 the Bankruptcy Court entered an order (a) conditionally approving the Disclosure Statement as containing "adequate information" for purposes of Section 1125 of the Bankruptcy Code, (b) scheduling the last date to (i) submit a ballot accepting or rejecting the

Plan and (ii) to file and serve an objection to the Plan on June __, 2015 and (c) scheduling a hearing on Confirmation of the Plan for June __, 2015 at 11:00 a.m.

Under Section 1126(b) of the Bankruptcy Code, only Classes[1] of Allowed Claims that are "impaired" under the Plan, as defined by Section 1124 of the Bankruptcy Code, are entitled to vote on the Plan. Generally, a Class is impaired if its legal, contractual or equitable rights are altered or reduced under the Plan. Under the Plan, Classes 1, 2, 3, 4, 5 and 6 are impaired and are therefore entitled to vote to accept or reject the Plan.

To be accepted by a Class, the Plan must be accepted by more than one half in number and two-thirds in dollar amount of the Allowed Claims actually voting in such Class.

Accompanying this Disclosure Statement is a copy of the Plan.

## I. INTRODUCTION

### A. Background

The Debtor is a single asset real estate entity that owns a vacant lot located at 75 First Avenue, New York, New York 10003, Block 00446, Lot 0032 (the "Property").

The Property is located on the corner of First Avenue and East 5th Street in the East Village neighborhood of downtown Manhattan. The area is characterized by a mixture of residential loft buildings, trendy restaurants, 'quick' food stores, a wide variety of high-end retail establishments, and food and dry goods wholesalers.

The Property was acquired by the Debtor in April of 2005 for $3.7 million for the purpose of developing a high-rise condominium building. The acquisition of the Property was partially

---

1 Capitalized terms not defined herein have the same meaning ascribed to them in the Plan.

funded by a $2.5 million mortgage from Titan-LB LLC.

In June, 2005, the Debtor acquired the air rights over the adjacent property located at 77-81 First Avenue, New York, New York. In connection with the acquisition of the air rights, the Debtor refinanced the property with Broadway Bank, which loan was subsequently assigned to Chinatrust Bank (U.S.A.) ("Chinatrust").

The Debtor again refinanced the property with Chinatrust in August, 2007, extending the indebtedness to $15 million to provide the Debtor with sufficient monies to construct a high rise building.

The Debtor's initial plans were to construct a ten (10) story building. However, in 2008, the Department of Buildings retroactively rescinded the permits issued to the Debtor to construct the building, stating an erroneous interpretation of the "Sliver Rule".

The "Sliver Rule" was intended to prevent narrow buildings that are taller than adjacent buildings. The "Sliver Rule" states that a building wider than 45 feet at the maximum base height might be exempted from the height restriction. The "Sliver Rule" had been previously interpreted to allow the Debtor to proceed with its plans to construct a building on the Property above 100 feet.

However, the NYC Department of Buildings subsequently determined that with the current definition of "building", a narrow building that abuts an existing building on the same zoning lot may utilize the width at the base height of such adjacent building to qualify for exemption from the "Sliver Rule" and thus may add narrow stories above the base. As it relates to the Debtor's property, the lot measures 24 feet by 100 feet, but combined and merged with the

adjacent property, the Property measures 100 feet by 100 feet.

However, the NYC Department subsequently found this definition to be contrary to the intent of the "Sliver Rule", and as a result the amended definition of building, the "Sliver Rule" will apply to each building separately.

As a result, the NYC Department of Buildings retracted their findings which had allowed the Debtor to construct a building 100 feet high, and instead the maximum height of the building to be constructed was significantly reduced to eighty (80) feet.

The Debtor proceeded with its efforts to develop the lot, and plans were drafted and approved to create an eight (8) floor building with twenty-seven (27) residential units and one (1) commercial unit, totaling 30,000 square feet.

The Debtor also acquired certain air rights form the adjacent property, bringing significantly increased value to the Property upon sale.

The Debtor began its construction on the building, but when Chinatrust discovered the zoning changes, it ceased funding the construction loan and held the Debtor in default. Chinatrust began a foreclosure proceeding against the Debtor in 2009. Instead of pursuing the foreclosure proceeding, Chinatrust ultimately sold and transferred the loan to MS Kearny CT 1 LLC, which then transferred the loan to Titan Capital ID LLC and then Sutherland Asset I, LLC ("Sutherland").

At the time Chinatrust pulled its funding, the outstanding balance on the loan was approximately $8.3 million. Without the availability of the construction loan, the Debtor was unable to complete the build out. Instead, the Debtor's principals were able to negotiate a very

favorable discount purchase option with Titan in the amount of $4.7 million (the "DPO").

In order to take advantage of the DPO, the Debtor's majority principals formed a new affiliate corporation, 75 First Avenue, LLC ("75 LLC"), which raised $1.0 million in to pay down the DPO. The remaining $3.7 million in principal owed to Sutherland, together with interest and an extension fee to bring the total aggregate indebtedness, together with accruing interest thereon after April 22, 2015, in the amount of $4,108,134.27, is payable as an option held by 75 LLC which was set to expire on or before April 22, 2015 but has now been extended until August 22, 2015 (the "Option"). Without the Option, the payoff to Sutherland is in excess of $12.5 million.

75 LLC shares approximately 60% common ownership as the Debtor, as outlined below (common owners listed in italics):

| Debtor's Members | 75 First Avenue LLC Members |
|---|---|
| Anthony C. Marano - 42% | Anthony C. Marano- 18.71% |
| Anthony M. Marano - 12% | Anthony M. Marano – 4.67% |
| Dean Galasso - 4% | Manhattan Properties (Galasso) – 35.82% |
| Lou Galasso, III - 10% | AMB Partners – 36.07% |
| Paul Galasso - 15% | Minetta Group, LLC – 4.73% |
| Scott Marano - 13% | |
| Chris Tokarski - 2% | |
| Sepp Dobbler - 2%. | |

Over the past five (5) years, the Debtor has been aggressively marketing the Property for sale while it attempts to resolve its issues amongst its members, and the members of 75 LLC.

The Property has been listed with approximately twenty (20) brokers and the Debtor has received offers between $11.5 million and $13 million. The Debtor, in its business judgment, has elected to go to contract with 75 First Avenue Club, LLC, an entity wholly unrelated to the

Debtor or any of its insiders, for $12,900,000. See discussion *infra*.

The Debtor intended to use the bankruptcy proceeding to consummate the sale of the Property and maximize distribution to all of its creditors, secured and unsecured alike.

Prior to the Chapter 11 case, AMB Partners and Andrew Bradfield, its principal, commenced an arbitration  (the "Arbitration") against the other members of 75, LLC seeking various forms of relief and assertion of claims, including but not limited to claims against the Debtor. The arbitration was stayed by preliminary decision of the American Arbitration Association shortly after commencement of the Chapter 11 case.

## B. Commencement of the Chapter 11 Case

On January 28, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code.

The Debtor filed this chapter 11 case in order to permit breathing room from its creditors in order to adequately sell its assets for sale for the highest and best price and to further permit the members of the Debtor and 75, LLC to resolve their *inter se* disputes.

## C.  Employment of the Debtor's Professionals

On January 30, 2015, the Debtor filed an application to retain DelBello Donnellan Weingarten Wise & Wiederkehr, LLP ("DDWWW"), as its bankruptcy counsel. By order of the Bankruptcy Court dated February 19, 2015, the Bankruptcy Court approved the retention, *nunc pro tunc,* to the Petition Date.

**D. Filing of Schedules of Assets and Liabilities and Statement of Financial Affairs**

On February 11, 2015, the Debtor filed its Schedules of Assets and Liabilities, together with its Statement of Financial Affairs (collectively, the "Schedules"). The Debtor's Schedules are available on the Bankruptcy Court's website: www.nysb.uscourts.gov (log-in and password required) or from counsel for the Debtor upon written request.

**E. Establishment of a Claims Bar Date and Claims Process**

Pursuant to an order of the Bankruptcy Court entered on March 18, 2015, April 28, 2015 was established as the last date by which creditors (other than governmental units) may file proofs of claim in the Chapter 11 case and September 14, 2015 (together, the "Bar Dates") was established as the last date by which governmental units may file proofs of claim in the Chapter 11 case, and subsequently notice of the Bar Dates was served on all creditors listed on the Debtor's creditor matrix filed with the Bankruptcy Court as well as parties filing notices of appearance and creditors who had previously filed a proof of claim in the case.

**F. Lift Stay Motion Concerning the Arbitration**

The Debtor and Beys each opposed the motion from AMB Partners and Andrew Bradfield which sought, in the alternative, a determination that the automatic stay did not apply, or that the stay should be lifted, with respect to non-Debtor related matters within the Arbitration (the "Lift Stay Motion").

On March 19, 2015 the Bankruptcy Court entered an order granting the Lift Stay Motion. As of this date, the Arbitration had not been rescheduled. However, the Debtor intensified its efforts to obtain a global resolution between the members of the Debtor and 75, LLC, which negotiations have resulted in, inter alia, the consensual Plan.

**G. Sale of the Property**

As a result of the hard work and expertise of the Debtor and its professionals, and in the exercise of its sound business judgment, a purchaser has been procured for the sale of the Property in the form of a private sale through the Plan. The Debtor has exhaustively marketed the Property over the past 3 years, sand the proposed Purchaser has agreed to buy the Property for current fair market value, as is where is, without material conditions or further due diligence and is willing to close on the Sale within 60 days after the Effective Date of the Plan.

The proposed purchaser, 75 First Ave Club, LLC ("Purchaser"), is not connected or related to the Debtor, 75, LLC or any of their respective members, insiders or affiliates and is represented by separate counsel. The purchase price of 12,900,000 will be used to satisfy the discounted and compromised claims of: (a) Sutherland Asset I, LLC, the current first mortgage holder; (b) 75, LLC, its contemplated assignee and, from the personal contribution of the non-Andrew Bradfield members of 75, LLC, (c) the junior lien claim of Petros Beys.

For purposes of full disclosure, the Debtor's managing member, Anthony C. Marano, who singlehandedly located and procured the Purchaser and is a licensed real estate broker in the State of New York, shall, as permitted under the Debtor's Operating Agreement, receive a $774,000 sales commission from the Sale Proceeds upon closing, which commission Anthony

8

Marano has agreed to contribute towards the obligations owed to Beys under the Plan.

A copy of the Purchase and Sale Agreement is annexed to the Plan as Exhibit "A'. Although the sale is not being made subject to higher and better offers, (a) all of the Debtor's secured creditors have agreed to the terms of sale and (b) the Debtor's remaining non-insider creditors, consisting of a few general unsecured claimholders, will be paid the allowed amount of their unsecured claims in full from the Sale Proceeds.

**Request and Justification For Private Sale.**  While many section 363 sales are conducted under competitive bidding procedures, there is no requirement in section 363 of the Bankruptcy Code to do so.

In fact, Bankruptcy Rule 6004(f) specifically contemplates private sales with the statement that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction".  Here, the Debtor and the secured creditors support the private sale.

Courts have noted that private sales are appropriate under section 363 in circumstances similar to the instant case. *See In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) ("Unlike judicial sales under the Bankruptcy Act, the sale of estate property under the Bankruptcy Code is conducted by a trustee, who has ample discretion to conduct public or private sales of estate property."); *Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect sales of estate property pursuant to section 363 of the Bankruptcy Code, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction").

Accordingly, courts in this District have approved private sales of assets when they think the general standards for approval under section 363 of the Bankruptcy Code are satisfied. See, e.g., *In re Wellman, Inc.*, Case No. 08-10595 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2009) (order approving the sales of one of the debtors' facilities' by private sale, not subject to higher and better offers); *In re Delta Air Lines, Inc.*, Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Nov. 29, 2005) (order authorizing the sale of certain aircraft by private sale and stating that "no auction was necessary with respect to sale of the [a]ircraft").

Given (a) the substantial pre-petition marketing of the Property, (b) the lack of any other firm or formal offer to date, (c) Purchaser's unwillingness to make its offer subject to higher and better offers, thereby risking losing the Purchaser if the sale were made subject to higher and better offers, (d) the significant cash purchase price being offered by the Purchaser, (e) the illiquidity of the Debtor, (f) the lack of contingencies or material conditions to closing and (g) the need to immediately consummate a sale as required under the 75, LLC and Beys Settlement Agreements (as defined below), the Debtor believes that the private sale is justified and the best way to maximize value and return to creditors.  As the Debtor's creditors have indicated or are likely to accept the treatment offered under the Plan, which Plan is based in material part on the Sale, there is no prejudice to any creditor or other party in interest by moving forward with a private sale..

In addition, the secured creditors, as the primary economic stakeholder in this transaction, have not indicated that they would pay the costs associated with a more extended sale or plan process. Nor does the Debtor have any other source to fund such an extended process. By

contrast, selling the Property by a private sale will allow the Debtor to expeditiously collect proceeds in an amount sufficient to fund the Plan while avoiding the possibility of significant unfunded administrative costs or operating losses being incurred.

It is submitted that the Debtor and the Purchaser, in full consultation with the other interested parties in this Chapter 11 case, are proceeding in good faith and at arm's length. The Purchaser is not an insider of the Debtor and the transaction was negotiated in good faith and only entered into after protracted negotiations.

The exigencies of this case dictate that a private sale be approved.  Simply put, if the Debtor were forced to engage in an auction process, the delicate balance that has been achieved by virtue of, inter alia, the 75, LLC Settlement Agreement and the proposed treatment of the secured creditors as set forth in the Plan, additional interest, fees and costs will accrue to the detriment of all creditors.

For all of these reasons, the private sale of the Property as requested herein should therefore be approved.

**H. The 75, LLC Settlement Agreement**

**T**he Debtor's principals have recently reached a global settlement/resolution with, inter alia, the members of 75, LLC, which settlement resolves, *inter alia*, the *inter se* disputes among the 75, LLC members, settles the Arbitration in full and paves the way for a global consensual sale process in the Chapter 11 case.

A copy of the 75, LLC Settlement Agreement is annexed to the Plan as Exhibit "B" and is specifically incorporated therein and made a part thereof.

11

By virtue of the 75, LLC Settlement Agreement, the Debtor and 75, LLC are able to preserve the benefits under the DPO Agreement as well as the discount offered by Beys, both of which were set to expire, or had expired, by mid-April, 2015. By preserving these discounts, the Debtor is now able to deliver the Sale Agreement and propose the Plan, which will result in consensual treatment of each class of non-insider, impaired creditors.

## II.  THE PLAN OF REORGANIZATION

THE FOLLOWING IS A BRIEF SUMMARY OF THE PLAN. THE PLAN REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT AND CREDITORS ARE URGED TO CONSULT WITH THEIR COUNSEL IN ORDER TO FULLY UNDERSTAND THE PLAN AND TO MAKE AN INTELLIGENT JUDGMENT CONCERNING IT. THE PLAN GOVERNS OVER ANY DISCREPANCY IN THIS SUMMARY.

A.     **Plan Funding.** The Plan will be funded with (a) the net proceeds from the sale of the Property, after the payment of all costs of closing, including but not necessarily limited to typical and customary closing costs and (b) certain personal contributions from the members of the Debtor and certain members, other than Andrew Bradfield, of 75, LLC, in accordance with the 75, LLC Settlement Agreement..

B.     **Means for Implementation –Sale.** The Debtor seeks approval of the Sale of the Property, which Sale shall be made pursuant to and in connection with the Plan. It should be noted that the  Plan contemplates a Closing on the sale of the Property no later than 60 days after the Effective Date.

C.     **Sale of Real Property.** Purchaser shall acquire, and the Debtor shall convey all of the right, title and interest that Debtor possesses as of the closing in and to the Property free and clear of all pre-closing liens, Claims, encumbrances, other interests, debts, causes of action,

obligations, liabilities, and charges of any kind, nature or description whatsoever, whether fixed or contingent, legal or equitable, perfected or unperfected except as expressly provided in the purchase agreement (collectively, the "Liens and Claims"). All persons and entities asserting Liens and Claims of any kind or nature whatsoever against or in Debtor or the Property, including but not limited to the Class 1, 2, 3, 4 and 5 Claims, arising under or out of, in connection with, or in any way relating to, Debtor, the Property, or the transfer of the Property to Purchaser, shall be forever barred, estopped, and permanently enjoined from asserting such Liens and Claims against purchaser, its successors or assigns, its property, or the Property, provided that all such Liens and Claims shall attach to the proceeds of sale of the Property in the same order of priority and to the same extent and shall have the same validity as such Liens and Claims presently have with respect to the Property.

C.    **Tax Exemption.** The Plan expressly contemplates Closing on the sale of the Property after the Confirmation Date (approximately 60 days after the Effective Date). The post-Effective Date sale of the Property shall therefore not be taxed under any law imposing a stamp, real estate transfer, mortgage recording, sales use or similar tax as provided for under Section 1146(a) of the Bankruptcy Code.

D.    **Rejection of Unexpired Leases and Executory Contracts.**  All unexpired leases and executory contracts to which the Debtor is a party shall be deemed rejected. The Property shall be conveyed to the Purchaser free and clear of all such obligations, including any tenancies. Any resultant rejection damage Claims must be filed with the Clerk of the Court and served upon counsel for the Debtor no later than twenty-five (25) days after notice of occurrence of the

13

Confirmation Date.

      F.     **Treatment of Unclassified Claims Under the Plan**

      1.     <u>Allowed Administrative Claims other than Claims of Professionals</u>:  The Debtor does not anticipate any significant Allowed Administrative Claims, other than the Claims of the Professionals. However, to the extent that any other such Claims should exist, they shall be paid from the proceeds of sale on or shortly the Sale Closing Date or as soon as is practicable thereafter.

      2.     <u>Allowed Administrative Claims of Professionals</u>:  Allowed Administrative Claims of Professionals shall be paid, in full, in cash, from the Distribution Fund (or to the extent necessary, the Post-Confirmation Date Reserve) upon the later of (i) allowance by the Court pursuant to Section 330 of the Bankruptcy Code, and absent an agreement with the Class 1 Secured Creditor, 11 U.S.C. §506(c), or (ii) the Sale Closing. As of the filing of this Disclosure Statement, the only Allowed Administrative Claims are those of DDWWW, Debtor's counsel, which net unpaid Claim is anticipated to total approximately $125,000 through the Sale Closing Date.

      3.   <u>United States Trustee's Fees</u>: Under the Plan, all United States Trustee statutory fees arising under 28 U.S.C. § 1930 and 31 U.S.C. §3717 through  the Effective Date shall be payable by the Effective Date, or as soon as is practicable thereafter. Thereafter, such fees shall be paid in full, in cash, in such amount as incurred in the ordinary course of business by the Debtor from the Post-Confirmation Date Reserve.  The Debtor shall effectuate payment of United States Trustee quarterly fees through the entry of a final decree closing the case on behalf of the Debtor who

shall be responsible therefore.  These fees are anticipated to be approximately $13,650.

4.  <u>Allowed Priority Claims</u>:  The Debtor shall pay, in full and in cash, Allowed Priority

Claims (entitled to Priority pursuant to Section 507(a)(3)-(8) of the Bankruptcy Code) on the

Effective Date or as soon as is practicable thereafter. Such Claims shall include, but not be

limited to, the Claims of the City of New York for real estate taxes, water and sewer charges and

violations of any kind. The Debtor anticipates these Claims to be less than approximately

$25,000.

### G.    Treatment of Classes

<u>Class 1</u>: The Allowed Secured Claim of Sutherland Asset I, LLC shall be paid, in cash,

from the Sale proceeds, on the Sale Closing Date,  the discounted amount of $4,113,195.32

together with per diem interest and other required fees from April  23, 2015 at the rate provided

under the Option Extension Letter Agreement dated April 18, 2015 (the "DPO Extension

Agreement"). In exchange for such payment, the Class 1 claimholder shall, in accordance with

the DPO Extension Agreement, simultaneously assign all of its Claims, liens, mortgages and

security interests against, inter alia, the Debtor and the Property to 75, LLC at the Sale closing.

Class 1 Claims are impaired under the Plan and are entitled to vote to accept or reject the Plan.

<u>Class 2</u>:  The Allowed Secured Claim of 75, LLC  as assignee of Sutherland Asset I,

LLC shall receive, in cash, from the Sale Proceeds, on the Sale Closing Date, the remaining net

proceeds from the Sale after payment in full of (a) all unclassified Claims, (b) all Allowed

Administrative Expense Claims, (c) all Allowed Claims of Professionals, (d) all Allowed Priority

Claims, if any, (e) the Allowed Class 3 Secured Claim in the amount of $1,250,000 and (f)  the

15

Post-Confirmation Reserve on the later of the Sale Closing Date or the Effective Date, in full and final satisfaction of all claims against the Debtor.   Class 2 is anticipated to receive approximately $6,750,,000 from the sale Proceeds. The members of  75, LLC shall, in turn, each receive distribution hereunder in accordance with the 75 LLC Settlement Agreement.  The Allowed Class 2 Secured Claim holder is impaired under the Plan and shall be entitled to vote to accept or reject the Plan.

Class 3: The Allowed Secured Claim of Petros M. Beys shall be paid in the discounted amount of $1,250,000, in cash, from the Sale Proceeds, on the Sale Closing Date,  in full and final satisfaction of any and all Claims against the Debtor, its members, officers, agents, representatives and assigns, including but not limited to Anthony M. Marano, Anthony C. Marano and Scott A. Marano. The Allowed Class 3 Claim is impaired under this Plan and shall be entitled to vote to accept or reject the Plan.

Class 4 The Allowed General Non-Insider Unsecured Claims, if any, shall be paid in full, in cash, without interest, within 15 days of the later of the (a) Sale Closing Date or (b) the Effective Date, in full and final satisfaction of all Claims against the Debtor. The Debtor believes such claims do not exceed $50,000.  Allowed Class 4 Claims are impaired and shall be entitled to vote to accept or reject the Plan.

Class 5: The Allowed General Insider Unsecured Claims shall not receive a distribution under the Plan.  Class 5 Claims total approximately $600,000. Allowed Class 5 Claims are impaired under this Plan and are deemed to reject the Plan.

<u>Class 6:</u> The Allowed Interests shall not receive any distribution under the Plan. The Class 6 Interest holders are impaired under this Plan and are deemed to reject the Plan.

**H.    Resolution Of Disputed Claims & Reserves**

(a)    <u>Objections</u>.  An objection to the allowance of a Claim shall be in writing and may be filed with the Bankruptcy Court by the Debtor or any other party in interest no later than the Effective Date.

(b)    <u>Amendment of Claims</u>.  A Claim may be amended only up to seven (7) days prior- to the Effective Date, unless agreed upon by the Debtor and the holder of such Claim and as approved by the Bankruptcy Court or as otherwise permitted by the Bankruptcy Code and Bankruptcy Rules.  The foregoing notwithstanding, MB Financial shall be permitted to amend its Class 1 Claim to include such amounts which may have been unliquidated and/ or contingent as of the date of the filing of the Claim until such time as the Class 1 Claim is Allowed and paid in full.

(b)    <u>Reserve for Disputed Claims</u>.  In the event that a Disputed Claim is not resolved by the Effective Date and the Disbursing Agent decides, in its discretion, to effectuate distributions to holders of Allowed Claims in the same or junior Classes to the Disputed Claim, the Disbursing Agent shall, to the extent that sufficient funds are available in the Distribution Fund, reserve, on account of each holder of a Disputed Claim, that property which would otherwise be distributable to the holder on such date were the Disputed Claim at issue an Allowed Claim, or such other property as the holder of the Disputed Claim at issue and the Debtor may agree upon.  The property so reserved for the holder, to the extent that the Disputed

17

Claim is Allowed, and only after the Disputed Claim becomes a subsequently Allowed Claim, shall thereafter be distributed to such holder as provided below.

(c)    <u>Claims Procedures Not Exclusive</u>. All of the aforementioned Claims procedures are cumulative and not necessarily exclusive of one another. On and after the Confirmation Date, Claims which were previously disputed may subsequently be compromised, settled, withdrawn, or otherwise resolved without further order of the Bankruptcy Court.

**I. Amendment, Modification, Withdrawal or Revocation of the Plan.**

The Debtor reserves the right, in accordance with the Section 1127 of the Bankruptcy Code, to amend or modify the Plan by Order of the Bankruptcy Court, as may be required.

The Debtor may withdraw or revoke the Plan prior to the Confirmation Date. If such a withdrawal or revocation occurs, or if Confirmation does not occur, the Plan will be null and void. In such event, nothing contained in the Plan will constitute a waiver or release of any Claim by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any other person in any further proceedings involving the Debtor.

**J. Unclaimed Property**

Except as otherwise provided herein, in the event any claimant fails to claim any distribution within four (4) months from the date of such distribution, such claimant shall forfeit all rights thereto and to any and all future payments, and thereafter the Claim for which such cash was distributed shall be treated as a disallowed Claim. Distributions to claimants entitled thereto shall be sent to their last known address set forth on the most recent proof of claim filed with the Bankruptcy Court or, if no proof of claim is filed, on the Schedules filed by the Debtor or to such

other address as may be later designated by a creditor in writing to the Disbursing Agent. The Debtor shall use its best efforts to obtain current addresses for all claimants. All unclaimed cash shall be redistributed by the Debtor pro rata in accordance with Article III of the Plan.

**K. Plan Injunction**

*Upon the Confirmation Date, but subject to the occurrence of the Effective Date, all persons who have held, hold or may hold Claims or Interests are enjoined from taking any of the following actions against or affecting the Debtor or assets of the Debtor with respect to such Claims, Interests or Administrative Claims, except as otherwise set forth in the Plan, and other than actions brought to enforce any rights or obligations under the Plan or appeals, if any, from the Confirmation Order:*

*(i) Commencing, conducting or continuing in any manner, directly or indirectly, any suit, action, arbitration, or other proceeding of any kind against the Debtor or the assets of the Debtor regarding the Claims or Interests;*

*(ii) Enforcing, levying, attaching, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the assets of the Debtor;*

*(iii) Creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the assets of the Debtor;*

*(iv) Asserting any setoff, right of subrogation, or recoupment of any kind, directly or indirectly, against the Debtor, the assets of the Debtor; and*

*(v) Proceeding in any manner and any place whatsoever that does not conform to or*

*comply with the provisions of the Plan.*

      **L. Exculpation.** *Neither the Debtor nor any of its respective members, shareholders, managers, officers, directors, employees, attorneys, advisors, agents, representatives and assigns (the "Released Parties") shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the chapter 11 case or the Plan and any related agreement except for bad faith, willful misconduct, gross negligence, breach of fiduciary duty, malpractice, fraud, criminal conduct, unauthorized use of confidential information that causes damages, and/or ultra vires acts. Notwithstanding any other provision hereof, nothing in Sections 8.2 or 8.3 of the Plan shall (a) effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in Sections 8.2 or 8.3 of the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against any of the Released Parties referred to herein for any liability whatever, including, without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority, nor shall anything in this Plan exculpate any party from any liability to the United*

*States Government or any of its agencies or any state and local authority whatsoever, including liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Parties referred to herein, or (b) limit the liability of the Debtor's professionals to the Debtor pursuant to Rule 1.8(h)(1) of the New York Rules of Professional Conduct.*

### M.  Full and Final Satisfaction

To the fullest extent permitted by Section 1141(a)-(c) of the Bankruptcy Code, all payments and all distributions pursuant to the Plan, shall be in full and final satisfaction, settlement and release of all Claims and Interests, except as otherwise provided in the Plan. Nevertheless, under Section 1141(d) of the Bankruptcy Code, the Debtor will not receive a discharge because the Plan is a liquidating plan.

### N. Retention of Jurisdiction

The Bankruptcy Court shall retain jurisdiction of the chapter 11 case:

(a)  To determine all controversies relating to or concerning the allowance of and/ or distribution on account of such Claims or Interests upon objection thereto which may be filed by any party in interest;

(b)  To determine requests for payment of Claims entitled to priority under Section 507(a)(2) of the Bankruptcy Code, including any and all applications for compensation for professional and similar fees

(c)  To determine any and all applications, adversary proceedings, and contested or litigated matters over which the Bankruptcy Court has subject matter jurisdiction pursuant to 28

U.S.C Sections 157 and 1334;

(d)   To determine all disputed, contingent or unliquidated Claims and all disputed Interests;

(e)  To determine requests to modify the Plan pursuant to Section 1127 of the Bankruptcy Code or to remedy any defect or omission or reconcile any inconsistencies in this Plan or Confirmation Order to the extent authorized by the Bankruptcy Code;

(f)  To make such orders as are necessary or appropriate to carry out the provisions of the Plan;

(g)  To resolve controversies and disputes regarding the interpretation or enforcement of the terms of the Plan; and

(h)  To enter a final decree closing the Debtor's chapter 11 case.

 **O. Contracts and Unexpired Leases.** The Debtor believes there are no executory contracts.

 **P. Post-Confirmation Fees, Reserves and Final Decree**

The reasonable compensation and out-of-pocket expenses incurred post-Confirmation Date by the Debtor's professionals retained in the Chapter 11 case shall be paid by the Debtor within ten (10) days upon presentation of invoices for such professional services. All disputes concerning post-confirmation fees and expenses shall be subject to Bankruptcy Court jurisdiction.

22

The Debtor shall reserve $50,000 from the Distribution Fund for the payment of post-Confirmation professional fees, with any balance remaining to be distributed to the Class 2 Secured Creditor.

A final decree shall be entered as soon as practicable after initial distributions have commenced under the Plan.

**Q. Continuation of Bankruptcy Stays**

All stays provided for in the chapter 11 case under Section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**R. Avoidance and Recovery Actions**

The Debtor believes, after a thorough investigation and review with its counsel, that there are no causes of action under Sections 544, 547, 548, 550 and 553 of the Bankruptcy Code. As such, the Debtor does not intend to pursue any such cases of action.

### III.    FINANCIAL INFORMATION

**A. The Debtor's Schedules of Assets and Liabilities**. Schedule of the Debtor's assets and liabilities have been filed with the Clerk of the Court and may be inspected by all interested parties.

**B. Chapter 7 Liquidation Analysis.**    Because the Debtor's only asset is being liquidated under the Plan, no scenario exists, including but not limited to Chapter 7 liquidation, under which the creditors would be entitled to receive a distribution greater than that which the Debtor has proposed in its Plan.

23

# IV. <u>CONFIRMATION PROCEDURE</u>

**A.     Voting.**   As set forth hereinabove and in the Plan, Classes 1 through 4 are impaired under the Plan, and accordingly, holders of Allowed Claims in such Classes shall be permitted to vote on the Plan.

**B.     Acceptance of the Plan**

This Disclosure Statement is provided in connection with the solicitation of acceptances of the Plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a class of Claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number of the allowed Claims of that class that have actually voted or are deemed to have voted to accept or reject a plan.  The Bankruptcy Court will confirm the Plan only if it finds that all of the requirements of Section 1129(a) or (b) of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan (i) is accepted by all impaired Classes of Claims and Interests or, if rejected or deemed rejected by an impaired Class, "does not discriminate unfairly" and is "fair and equitable" as to each rejecting class; (ii) is feasible; and (iii) is in the "best interest" of Creditors and Interest holders impaired under the Plan

**C.     Solicitation of Votes**

Each Holder of a Claim in Classes 1 through 4 has been sent a ballot together with this Disclosure Statement. The ballot is to be used for voting to accept or reject the Plan.

The Bankruptcy Court has directed that, to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be mailed or delivered by hand or courier so that they

24

are <u>ACTUALLY RECEIVED</u> no later than 5:00 p.m. (Eastern Standard Time) on June __, 2015

at the following address:

DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
One North Lexington Avenue
White Plains, New York 10601
Attn:   Jonathan S. Pasternak, Esq.

Each Holder of an Allowed Claims and Interests in Classes 1 and 5 shall be entitled to

vote to accept or reject the Plan as provided for in the order approving the Disclosure Statement.

A vote may be disregarded if the Bankruptcy Court determines that such vote was not solicited or

procured in good faith and in accordance with the Bankruptcy Code.

**C.      Fair and Equitable Test; Cramdown.**

Notwithstanding a rejection by a Class, the Bankruptcy Court may confirm the Plan and

the Plan will be binding upon all Classes, including the Classes rejecting the Plan, if it is

demonstrated to the Bankruptcy Court that at least one impaired Class of Claims has accepted the

Plan and that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to

each non-accepting Class. A plan does not discriminate unfairly if the legal rights of a dissenting

Class are treated in a manner consistent with the treatment of other Classes whose legal rights are

similar to those of the dissenting Class and if no Class receives more than it is entitled to on

account of its Claims or Interests.

Under the Bankruptcy Code, the Debtor's Plan is "fair and equitable" if as to each

dissenting Class the holders of Claims and Interests that are junior to the Claims of the dissenting

25

Class will not retain any property under the Plan and the holders of senior Classes of Claims are not paid more than the Allowed amount of such Claims.    Under the Plan, junior Classes of Claims will not receive any distribution until senior Classes of Claims are fully satisfied. Accordingly, the Debtor believes that the Plan "does not discriminate unfairly" and is "fair and equitable."

In order for the Plan to be confirmed over the objection of a dissenting secured creditor, the Plan must provide that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property. See 11 U.S.C. §1129(b)(2)(A).

**D. Confirmation Hearing.**  The Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan.  The Confirmation hearing has been scheduled for the date set forth on the Court Order which accompanies this Disclosure Statement.    The Confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjournment made at the Confirmation hearing. At the Confirmation hearing, the Bankruptcy Court will (i) hear and determine any objections to Confirmation of the Plan; (ii) determine whether the Plan meets the requirements of the Bankruptcy Code and has been proposed in good faith; and (iii) confirm or refuse to confirm the Plan.

26

### E.    Statutory Requirements for Confirmation of the Plan

At the confirmation hearing, the Debtor will request that the Bankruptcy Court determine that the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code. If so, the Bankruptcy Court shall enter an order confirming the Plan. The applicable requirements of Section 1129 of the Bankruptcy Code are as follows:

(a)    The Plan must comply with the applicable provisions of the Bankruptcy Code;

(b)    The Debtor must have complied with the applicable provisions of the Bankruptcy Code;

(c)    The Plan has been proposed in good faith and not by any means forbidden by law;

(d)    Any payment made or promised to be made by the Debtor under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the Plan and incident to the chapter 11 case, has been disclosed to the Bankruptcy Court, and any such payment made before Confirmation of the Plan is reasonable, or if such payment is to be fixed after Confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e)    The Debtor has disclosed the identity and affiliation of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtor under the Plan. Moreover, the appointment to, or continuance in, such office of such individual, is consistent with the interests of holders of Claims and Interests and with public policy. Since the Plan contemplates a liquidation of the Debtor's Property, the Debtor does not and will not

operate or generate income, there shall be no post-Confirmation compensation by the Debtor to the Debtor's existing management.

(f)    Feasibility and "Best Interest" Tests: The Bankruptcy Code requires that in order to confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor (the "Feasibility Test").

For a plan to meet the Feasibility Test, the Bankruptcy Court must find that the Debtor will possess the resources to meet its obligations under the Plan. Since the Plan contemplates a liquidation of the Debtor's assets, Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan. Moreover, on the Effective Date, the Debtor will have sufficient funds on hand to fund the Plan.

In addition, the Bankruptcy Court must determine that the values of the distributions to be made under the Plan to each Class will equal or exceed the values which would be allocated to such Class in a liquidation under Chapter 7 of the Bankruptcy Code (the "Best Interest Test"). The Best Interest Test with respect to each impaired Class requires that each holder of a Claim or Interest in such Class either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. Because the Debtor has proposed a liquidating Plan which distributes all proceeds thereof to holders of Allowed Claims in order of priority, no scenario exists, including but not limited to Chapter 7 liquidation,

under which the creditors would be entitled to receive a distribution greater than that which the Debtor has proposed in its Plan. In fact, were the Debtor's assets liquidated in a Chapter 7 case, the creditors of the estate would stand to receive far less as the Administrative costs associated with such a case would be significantly higher.

The Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, including the "best interest" and feasibility requirements. The Plan is "fair and equitable" and "does not discriminate unfairly". The Plan complies with all other requirements of Chapter 11 of the Bankruptcy Code and the Plan has been proposed in good faith.

F.    **Objections to Confirmation.**  Objections to confirmation must be in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector.  Any such objection must be filed with the Bankruptcy Court and served upon the following, with a copy to the Court's chambers, so that it is received by them on or before 4:00 P.M. on the date set forth in the Court Order which accompanies this Disclosure Statement:

DelBello Donnellan Weingarten Wise & Wiederkehr, LLP
Attorneys for the Debtor
One North Lexington Avenue
White Plains, New York 10601
Attn:  Jonathan S. Pasternak, Esq.

Objections to confirmation of the Plan are governed by Federal Rule of Bankruptcy Procedure 9014.

## V. ALTERNATIVES TO CONFIRMATION
   ## AND CONSUMMATION OF THE PLAN.

If the Plan is not confirmed and consummated, the alternatives include: (i) preparation and presentation of an alternative plan of reorganization; (ii) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code; or (iii) dismissal of the Chapter 11 case, which would result in all creditor claims and rights of collection and enforcement being restored in full.

## VII.  POST-CONFIRMATION

The Debtor shall be responsible for filing post-Confirmation reports with the Bankruptcy Court and shall pay all quarterly fees required under 28 U.S.C. § 1930 and 31 U.S.C. §3717, on behalf of the Debtor, until the earlier of (a) conversion or dismissal of this chapter 11 case or (b) entry of a final decree closing this chapter 11 case. The Debtor will continue to be managed by Guy Morris, its Managing Member who will receive no compensation for his services.

## VIII.  TAX CONSEQUENCES

A.        **Tax Consequences of Confirmation.**  Confirmation may have federal income tax consequences for the Debtor and holders of Claims and Interests.   The Debtor has not obtained and does not intend to request a ruling from the Internal Revenue Service (the "IRS"), nor has the Debtor obtained an opinion of counsel with respect to any tax matters.  Any federal income tax matters raised by Confirmation of the Plan are governed by the Internal Revenue Code and the regulations promulgated thereunder.  The Debtor, creditors and holders of Interests are urged to consult their own counsel and tax advisors as to the consequences to them, under federal and applicable state, local and foreign tax laws, of the Plan.  The following is intended to be a

summary only and not a substitute for careful tax planning with a tax professional. The federal,

state and local tax consequences of the Plan may be complex in some circumstances and, in some

cases, uncertain. Accordingly, each holder of a Claim or Interest is strongly urged to consult

with his or her own tax advisor regarding the federal, state and local tax consequences of the

Plan, including but not limited to the receipt of cash under this Plan.

   **B.**  **Tax Consequences to the Debtor.**  The Debtor may not recognize income as a

result of the discharge of debt pursuant to the Plan because Section 108 of the Internal Revenue

Code provides that taxpayers in bankruptcy proceedings do not recognize income from discharge

of indebtedness. However, a taxpayer is required to reduce its "tax attributes" by the amount of

the debt discharged. Tax attributes are reduced in the following order: (i) net operating losses;

(ii) general business credits; (iii) capital loss carryovers; (iv) basis in assets; (v) passive activity

loss and credit carryovers; and (vi) foreign tax credit carryovers.

**IX.** **NOTICES**

   All notices and correspondence should be forwarded in writing to:

One For the Money, LLC
4-6 West 14th Street, 2d Floor
New York, NY 10011
Attention: Anthony M. Marano

with a copy to:

DelBello Donnellan Weingarten Wise & Wiederkehr, LLP
One North Lexington Avenue
White Plains, New York 10601
Attn:  Jonathan S. Pasternak, Esq.

## X.  <u>RECOMMENDATION</u>

The Debtor believes that Confirmation of the Plan is preferable to any of the alternatives described above.  The Plan will provide greater recoveries than those available in liquidation to all holders of Claims.  Any other alternative would cause significant delay and uncertainty, as well as substantial additional administrative costs.

Dated: New York, New York
       May 27, 2015

ONE FOR THE MONEY LLC


By: */s/ Anthony Marano*
        Anthony M. Marano, Managing Member

DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
*Attorneys for the Debtor*


By: */s/ Jonathan S. Pasternak*
        Jonathan S. Pasternak
        One North Lexington Avenue, 11th Floor
        White Plains, New York 10601
        (914) 681-0200